The following opinion was misplaced in the confusion resulting from the burning of the clerk's office of the court of appeals, and is now published by direction of the court. ··                                      REPORTER.

CASE 1—PETITION EQUITY—DECEMBER 5, 1865.

## Strode, &c., vs. Magowan's heirs.

### APPEAL FROM FLEMING CIRCUIT COURT.

"I, by these presents, declare that I disinherit my nephew, *Johnson Strode*. He is not to have one cent of my estate; and my heirs-at-law will inherit my undivided estate, but he must have none." The above is the residuary clause of the will. The testator left no descendants, and his estate was claimed by the descendants of a sister of the whole blood, and of a brother of the half blood. The descendants of the sister resisted the claim of the descendants of the half-brother, on the ground that he was not a legitimate half-brother. *Held by the Court*—1. The law presumes that every child in a Christian country is, *prima facie*, the offspring of a lawful union of the parents, and that the mother, by actual marriage, or by cohabitation and recognition, was the lawful wife of the father; and in the absence of negative evidence, no supplemental proof of legal marriage will be necessary to legitimate the offspring. 2. Mere rumor is insufficient to bastardize issue, or require positive proof of actual marriage. If the presumption of legitimacy be false, repellant facts may be generally established; and if no such fact can be clearly proved, the presumption from mere filiation should stand. 3. "*Reputation*," in order to have any legal effect on a question of this sort, must originate in the family, or from the conduct or declarations of relatives presumed to know the truth, and to be disparaged by it. 4. The testator treated the descendants of his half-brother, who it was alleged was illegitimate, as legitimate, and manifested great affection for them as such. He kept and cherished two of them in his family, and treated them with peculiar confidence and affection as nephew and niece as long as he lived; and whether their father was in fact legitimate or not, the testator considered them as of the class of his "lawful heirs."

HARRISON TAYLOR and HARLAN & HARLAN, For Appellants,
CITED.—

7 *B. Mon.*, 132 ; *Kuhl vs. Knauer.*

2 *Brock.*, 256 ; *Stigall vs. Stigall.*

3 *A. K. Mar.*, 294 ; *Finlay vs. Humble et al.*

3 *A. K. Mar.*, 326 ; *Birney vs. Huren.*

1 *Greenleaf's Evidence, sec.* 28, *note* 2.

2 *Starkie's Evidence*, 196, *part* 17, *Am. ed., Bastardy.*

15 *Geo. R.*, 155 ; *Wright vs. Hicks.*

6 *How. Rep.*, 550 ; *Patterson vs. Gaines.*


W. H. CORD,        .        On same side
CITED—

7 *B. M.*, 132 ; *Kuhl vs. Knauer.*

8 *B. M.*, 612 ; *Remington vs. Lewis.*

2 *Bibb*, 426.

13 *B. M.*, 371 ; *Jones vs. Letcher.*

1 *Greenleaf on Evidence*, 116.

2 *Greenleaf on Evidence, sec.* 462.

3 *Greenleaf on Evidence, sec.* 461.

*Gresley's Equit. Evidence*, 318.

13 *Vesey*, 511.

18 *Vesey*, 443 ; *Walker vs. Wingfield.*

10 *Clark & Finnell*, 471 ; *Rolson vs. Atty. Genl.*

1 *Maddock*, 430 ; *Beachcroft vs. ———.*

4 *Per. & D.*, 193 ; *Doe vs. Bunyon.*

2 *Merivale*, 419.

2 *Pr. Williams*, 136 ; *Harris vs. Lincoln.*

1 *Vesey*, 231.

4 *Russell*, 384.

3 *Blackstone*, 212 ; *Newbury vs. Meade.*

1 *Vesey*, 313 *Beard vs. Travers.*

1 *Bullen*, 295.

Strode, &c., vs. Magowan's heirs.

T. C. CAMPBELL, On same side,

CITED—

3 *Johnson* ; *Jackson vs. Blanshon.*

1 *Hawkins*, 239, 384, 385.

1 *Greenleaf's Ev.*, secs. 570, 21, 142.

4 *Dana*, 423 ; *Bennett vs. Runyon.*

6 *Dana*, 110 ; *Cook's heirs vs. Totter's heirs.*

13 *B. M.*, 371.

3 *A. K. Marshall*, 326 ; *Birny vs. Hann.*

2 *Starkie's Ev.*, 833, *title Pedigree.*

1 *Starkie's Ev.*, 29–30–31.

*Randall's Peake*, 11.

4 *Mon.*, 367 ; *Taylor vs. Whiting.*

4 *J. J. Mar.*, 651 ; *Bank vs. Johnson.*

5 *J. J. M. ; Currie vs. Fowler.*

2 *Greenleaf*, 354.

2 *Starkie*, 833.

*Matthew's Presumptive Evidence*, 284.

8 *B. M.*, 511 ; *Remington vs. Lewis.*

STANTON & THROOP, E. C. PHISTER, and DANL.

K. WEISS, For Appellees,

CITED—

2 *Lee*, 244; *Taylor vs. Taylor.*

4 *Bradford*, 85.

*Best on Presumptions*, 57–8.

*Hubbeck on Successions*, 248–58.

7 *B. M.*, 132 ; *Kuhl vs. Knauer.*

4 *Bradford*, 85 ; *Ferries vs. Public adm'r.*

8 *B. M.*, 612 ; *Remington vs. Lewis.*

8 *B. M.*, 113 ; *Donnelly vs. Donnelly.*

5 *Barbour*, 215 ; *Clayton vs. Wardel.*

2 *House of Lords Cases*, 331; *Piers vs. Piers.*

2 *House of Lords Cases*, 566 ; *Morris vs. Davies.*

*Cla. & Fin.*, 163.

1 *Lee*, 571; *Taylor vs. Taylor.*

1 *Lee*, 271; *Lady Mayo vs. Brown.*

1 *Dessaussure's Equity R.*, 595 ; *Johnson vs. Johnson's ex'r.*

9 *Smith's N. Y. R.*, 94 ; *Canjoble vs. Ferrie.*

4 *Bradford*, 28.

26 *Barbour*, 177.

1 *Penn. R.*, 452 ; *Senser vs. Bower.*

6 *Howard*, 819 ; *Patterson vs. Gaines.*

4 *Johnson*, 52; *Fenton vs. Reed.*

8 *B. M.*, 113 ; *Donnelly vs. Donnelly.*

5 *J. J. Mar.*, 460 ; *Sneed vs. Ewing and wife.*

3 *Dana*, 232 ; *Storer vs. Boswell's heirs.*

3 *A. K. Mar.*, 369 ; *Dumarsly vs. Fishly.*

2 *Kent*, 86–7.

*Butler's Nisi Prius*, 112.

3 *A. K. Mar.*, 372.

28 *Law Jour. Rep.*, 745 ; *Goodman vs. Goodman.*

4 *Bing.*, 266 ; *Doe vs. Fleming.*

*Law Register, May*, 1865, 418.

*Burrill on Cir. Ev.*, 39th ed., 1859.

*Robertson's Scrap Book*, 218.

3 *A. K.*, 326 ; *Birney vs. Hann.*

13 *B. M.*, 371; *Jones vs. Letcher.*

1 *Greenleaf on Evidence*, 116, secs. 103–107.

2 *Smith's Leading Cases*, 119 (10 *East*); *Hingman vs. Ridgway.*

13 *Vesey, jr.*, 147; *Vowles vs. Young.*

13 *East*, 574 ; *Whitlock vs. Baker.*

1 *Philips on Evidence*, 238.

*Mathews on Presumptive Evidence*, 271.

2 *Saunders on Pleading and Evidence*, 58.

13 *Vesey*, 714, 148, 147.

6 *Tenn. Rep.*, 330.

*Bul. N. P.*, 112.

10 *East*, 120.

18 *Vesey*, 443–446.

*Cowper's Rep.*, 591; *Stevens vs. Moss.*

1 *Gilbert's Evidence*, 279.

1 *Wheaton's Selwyn's Nisi Prius*, 615.

2 *Bingham*, 86.

4 *Randolph*, 611; *Gregory vs. Baugh.*

2 *Conn. Rep.*, 348; *Chapman vs. Chapman.*

4 *N. H. Rep.; Waldron vs. Tuttle.*

7 *Curtis*, 605 (1 *Peters*, 337); *Elliott vs. Piersol.*

*Littell's Select Cases*, 24; *Nicholas vs. Landsdale.*

1 *Greenleaf, sec.* 570.

1 *Starkie and notes*, 7 *Am. ed. from* 3d *Lond. ed.*, 1842.

4 *B. & A.*, 376.

5 *T. R.*, 229.

2 *Atk.*, 44.

*Selwyn's N. P.*, 535, 517.

1 *Price*, 232.

2 *Price*, 308.

6 *Mad.*, 8.

2 *M. & L.*, 337; *King vs. Netherthong.*

1 *Esp. C.*, 275.

1 *Blackf.*, 162; *Henthorn vs. Doe.*

*Martin & Yerger*, 228; *Hawes vs. Peck's lessee.*

2 *Munf.*, 129; *Roberts vs. Stanton.*

7 *Wend.*, 371; *Hewlett vs. Cork.*

*MSS. Opinion, Winter Term*, 1861–2; *Means vs. Fair-burn et al.*

A. DUVALL,             On same side,

CITED—

*Best on Presumption*, 57.

*Wigram on Wills.*

1 *Met.*, 277.

2 *Dana*, 47.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

Abram Magowan, of Fleming county, Kentucky, who died in the year 1863, without a surviving descendant, made the following disposition of a residual portion of his estate, of the value of about two hundred thousand dollars, by his will, published in the year 1858:

" I, by these presents, declare that I disinherit my nephew, *Johnson Strode.* He must not have one cent of my estate; and my heirs-at-law will inherit my undivided estate, but he must have none."

This testamentary document, anomalous as it is, is constructively legatory; but its inappropriate use of technical words indicates that the testator did not understand the legal import of the terms "*heirs-at-law,*" any more than of the term "*inherit.*" And extraneous facts may therefore determine whom he considered his "heirs-at-law" and intended to be his devisees.

This suit in equity was brought by the executor to obtain a judicial settlement of that problem.

Numerous descendants of the testator's full and legitimate sister, Nancy Strode, mother of the pretermitted Johnson Strode, were made defendants as indisputable devisees. The only other persons who claim a beneficial interest under that devise are the descendants of William Magowan, who died about thirty years ago, was the recognized half-brother of the testator, and was born in Berkley county, Virginia, in 1769, about three years before the intermarriage of the father and mother of the testator and of his said sister Nancy.

But the appellees, descendants of that sister, assuming that by " lawful heirs " the testator meant his legit-

mate heirs, deny the legitimacy of the said William Magowan; and on that issue the parties made elaborate preparation by voluminous depositions and other evidence.

On the final hearing the circuit court adjudged to the appellees, as the legal descendants of William Magowan, the portion of half bloods; and the descendants of Nancy Strode, not content with that distribution, appeal to this court for a reversal.

The habitual recognition of the said William by the testator's father as his son, and by the testator himself as his brother, and also by his other brothers, all now dead without issue, and the like recognition by many of the appellants of said William's children as their cousins, are sufficiently established by proof. But these prescriptive recognitions do not necessarily prove that he was either the full or the legitimate half-brother of the testator. It is undeniable, however, that he was only a half-brother, and we concur with the circuit court in the conclusion that the legal probabilities preponderate in favor of his legitimacy.

For obvious reasons, the law presumes that every child in a Christian country is, *prima facie*, the offspring of a lawful rather than of a meretricious union of the parents, and that, consequently, the mother, either by actual marriage or by cohabitation and recognition, was the lawful wife of the father, and, in the absence of any negative evidence, no supplemental proof of legal marriage will be necessary to legitimate the offspring. Mere rumor is insufficient to bastardize issue or require positive proof of actual marriage. If the presumption be false, repellant facts may be generally established; and if no such fact can be *clearly* proved, the presumption from mere filiation should stand.

In this case the repellant evidence, when closely an-
alyzed, is but little more than flitting and intangible
rumor, intimating that William Magowan's mother was
not the wife of James Magowan, his acknowledged fa-
ther. A few witnesses of doubtful credibility testify, in
a manner rather incredible, that some of his brothers, on
some occasion, expressed doubt of his legitimacy, and
that the testator once said that he was "a stray." But
these declarations, if ever made, are neutralized by the
proof of the cordial intercourse and unqualified recog-
nitions of all parties until this litigation, and by the sig-
nificant fact that a multitude of the oldest and most
intimate acquaintances of the family, and intrinsically
the most credible witnesses, never heard any such sug-
gestion of doubt, or any such rumor of illegitimacy.

The mass of vague testimony relied on by the appel-
lants does not amount to "*reputation*," which must, to
have any legal effect, originate in the family, or from the
declarations and conduct of relatives presumed to know
the truth and to be disparaged by it. But even such
reputation would be effectually counteracted by the proof
of the invariable conduct of the testator towards his
brother William, and his endearing relations with some
of his children, whom he kept and cherished as members
of his household, and treated with a peculiar confidence
and affection as nephew and niece, as long as he lived.
Any other than presumptive evidence cannot be expected
or required in this case. The uncontradicted allegation
by the appellees, that the records of Berkley have been
destroyed by the desolations of successive wars since
1769, dispenses with registered proof of the marriage
of William's father and mother; and the lapse of nearly
a hundred years makes all proof of actual marriage,
or recognition of it by husband and wife, impossible.

The legal presumption of legitimacy, and the conduct and recognitions of all concerned, for more than fifty years, must be deemed the best evidence of which the case is susceptible, and is, in our judgment, not only admissible, but, all things considered, preponderant and sufficient.

But however this might be, it seems to us that the testator considered the appellees as of the class of his "lawful heirs," who were, as such, to share his estate. He treated them as legitimate, and manifested great affection for them as such, while at the same time he evinced comparative indifference towards the appellants, and even unkindness towards the *Strode* stock of his collateral heirs. And this construction of the will is fortified by the fact that, after he had published his will, he inquired whether some of the appellees were loyal to the Union, and said that none who were disloyal should have any portion of his estate, thereby clearly indicating that his will provided for the appellees, whom he held to be one branch of his lawful heirs; but that, if any of them should turn out disloyal, his will should be changed so as to cut off every such recreant. If he had not considered the appellees as his lawful heirs, and, therefore, his devisees, we could imagine no consistent motive for his inquiry and declaration in the form in which they were made. But the answer satisfied him that those devisees continued true to the Union; and, therefore, his will was never changed.

On two grounds, therefore, we approve the judgment of the circuit court—1st. We consider the rumors and the fugitive and doubtful declarations as to William Magowan's illegitimacy as at least equipoised by family recognitions peculiarly general, emphatic, and persistent; and, therefore, the best attitude in which the appellants

can judicially stand, is that in which they would have stood had nothing else appeared on either side than the fact that William Magowan was the oldest son of James Magowan, the fact that William was the testator's half-brother, and the fact that the appellees are William's lawful descendants. Without any other fact, the law presumes, and especially after the lapse of nearly one hundred years, that William was a legitimate son; and, consequently, that the appellees are "*lawful heirs*" of the testator, Abram Magowan. The circuit court decided the case on this ground alone.

2d. But we think that there is another and more satisfactory ground in the presumption (arising from the testator's conduct, declarations, and affections) that he recognized the appellees as among his "*lawful heirs*," and intended to embrace them by those words in his will.

We will only add, that when all the facts are carefully collated and considered, the fact that William Magowan was not provided for in his father's will is not essentially inconsistent with his recognized legitimacy; for it is as much a father's duty to provide for a natural as for a legitimate child; and therefore William's pretermission in his father's will ought not, according to the facts of this case, to be ascribed to illegitimacy.

Wherefore, the judgment appealed from is affirmed.